**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VICKIE L. ROBBINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13 CV 1756 DDN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Vickie L. Robbins for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and for supplemental security income under Title XVI of that Act, 42 U.S.C. §§ 1381, <u>et seq.</u> The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 7.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff Vickie L. Robbins, born April 26, 1960, filed applications for Title II and XVI benefits on July 10, 2007. (Tr. 225-34.) She alleged an onset date of disability of October 20, 2007, due to depression, right leg pain, and high blood pressure. (Tr. 342.) Plaintiff's applications were denied initially on November 20, 2007, and she requested a hearing before an ALJ. (Tr. 106-15.)

On April 27, 2010, following a hearing, the ALJ found plaintiff not disabled. (Tr. 87-96.) On October 27, 2011, the Appeals Council remanded the case to the ALJ. (Tr. 102-04.) On April 30, 2012, following another hearing, the ALJ found plaintiff not disabled. (Tr. 14-24.) On June 11, 2013, the Appeals Council denied plaintiff's request for review. Thus, the second decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

On September 5, 2000, plaintiff reported doing well after months without Celexa.[1] However, she lost her job, resulting in depression and anxiety, and began Celexa ten days prior to the date of the report.  She had since suffered mania and a racing mind.  Pathways Family Mental Health staff assessed that plaintiff suffered a pattern of leaving effective treatment programs and subsequently returning to the office seeking help.  She agreed to follow through with treatment and received prescriptions for lithium, Celexa, and Risperdal.[2]  (Tr. 643.)

On September 19, 2000, plaintiff complained of severe memory lapses.  Pathways Family Mental Health staff opined that lithium caused the memory lapses.  She received instructions to discontinue lithium and to increase the Celexa dosage.  (Tr. 644.)

On October 3, 2000, plaintiff reported improvement with her thinking and speech but no change in mood.  She further reported that Risperdal improved her sleep and mood stabilization.  Her clinical social worker described her mood as mildly depressed and affected by stress.  Pathways Family Mental Health staff assessed stable bipolar process and described her depression as reactive.  (Tr. 645.)

On November 7, 2000, plaintiff reported stable mood but complained of stress and poor concentration.  She also reported that she had ADHD.  Pathways Family Mental Health staff observed calm, appropriate mood, prescribed Wellbutrin, and decreased her Risperdal dosage.[3]  Plaintiff further described her daughter as out of control.  (Tr. 646-47.)

On December 5, 2000, plaintiff arrived an hour late to her Pathways appointment and had missed an earlier appointment.  Plaintiff reported that she had ADHD and that Wellbutrin improved her focus.  (Tr. 648.)

On January 2, 2001, plaintiff reported that she obtained employment at Mid-Missouri Graphics, received insurance coverage, and returned to school.  Her social worker expressed

---

[1] Celexa is used to treat depression.  WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

[2] Risperdal is used to treat certain mental/mood disorders.  WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

[3] Wellbutrin is used to treat depression.  WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

concern about plaintiff's abusive boyfriend. Pathways Family Mental Health staff described plaintiff as more motivated. (Tr. 649.)

On February 6, 2001, plaintiff described herself as tired due to overtime hours and abnormal work hours. She further intended to leave school due to work. Her social worker discussed the frequency of her meetings with plaintiff, and plaintiff agreed to meet more often. (Tr. 650.)

On March 6, 2001, plaintiff reported that she felt "really good." She planned to return to school and to work in the mental health field. She further reported that her boyfriend treated her and her children with respect. Pathways Family Mental Health staff discontinued Wellbutrin due to inability to pay. (Tr. 651.)

On April 3, 2001, plaintiff reported insomnia and that she averaged five hours of sleep per night. She received a prescription for Wellbutrin and an increased dosage of Risperdal. (Tr. 652.)

On June 5, 2001, plaintiff reported that she took Risperdal often after working overtime hours. Pathways Family Mental Health staff indicated that she missed her last appointment. (Tr. 653.)

On August 7, 2001, plaintiff reported that her employer terminated her but opined that she would be rehired. She planned to enroll at the Metro Business College. She reported no side effects from her medication, good mood, and good sleep. (Tr. 654.)

On October 2, 2001, plaintiff reported her intent to leave her boyfriend, whom she described as abusive. According to plaintiff, she had lived with her boyfriend for two years, and he held a knife to her throat. Pathways Family Mental Health staff described plaintiff as tearful. She received a prescription for Depakote and a decreased dosage of Celexa.[4] (Tr. 655.)

On November 6, 2001, her social worker discussed with plaintiff the need for improved compliance. Plaintiff reported that she could not tolerate Depakote due to headaches and that she and her boyfriend had attended religious counseling. She had also scheduled a vocational rehabilitation assessment. (Tr. 656.)

On December 21, 2005, plaintiff complained of hyperparathyroidism. She received an assessment of hyperparathyroidism and recommended a neck MRI scan. (Tr. 446.)

---

[4] Depakote is used to treat seizure disorders, certain psychiatric conditions, and to prevent migraine headaches. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

On December 28, 2005, plaintiff returned for a follow-up examination of her "failed back syndrome" after an L5-S1 fusion.[5]  She reported that epidural injections did not alleviate her pain. Jeffrey W. Parker, M.D., indicated that the nerve conduction studies and electromyography of the legs revealed no abnormalities.  A spinal CT scan revealed anterior pseudoarthrosis with loosening of the screws near the anterior interbody graft.  (Tr. 447.)

On January 4, 2006, plaintiff complained of nausea and mild epigastric discomfort and reported that Celexa controlled her depression.  She further complained of continued lumbosacral pain that radiated to the legs.  Richard Daugherty, M.D., assessed gastritis, lumbosacral pain, hyperparathyroidism, stress, and depression.  He instructed her to discontinue anti-inflammation medication, encouraged plaintiff to stop smoking, and prescribed Prilosec, Vicodin, and Flexeril.[6] (Tr. 434-36.)

On February 6, 2006, plaintiff reported increased depression and requested an increased dose of Celexa.  She further reported moderate back pain but that an injection five days earlier had improved the pain.  She reported right leg weakness and that she had scheduled parathyroid surgery on February 23, 2006.  Dr. Daugherty encouraged plaintiff to stop smoking and assessed lumbosacral pain with radiculopathy, gastroesophageal reflux disease, hyperparathyroidism, depression, bipolar disorder, and allergic rhinitis.  He prescribed Xanax, Zyrtec, hydrochlorothiazide, and potassium chloride, and increased her dosage of Celexa.[7]  (Tr. 431-32.)

On February 23, 2006, plaintiff underwent a parathyroidectomy to remove an adenoma. Michael Simmons, M.D., performed the procedure and indicated no complication.  (Tr. 452-54.)

---

[5] The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1–C7), twelve thoracic vertebrae (denoted T1–T12), five lumbar vertebrae (denoted L1–L5), five sacral vertebrae (denoted S1–S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman at 226, 831, 1376, 1549, 1710, Plate 2.

[6] Prilosec is used to treat certain stomach and esophagus problems.  WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).  Vicodin is used to relieve moderate to severe pain.  Id.  Flexeril is used short-term to treat muscle spasms.  Id.

[7] Xanax is used to treat anxiety and panic disorders.  WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).  Zyrtec is an antihistamine used to relieve allergy symptoms.  Id. Hydrochlorothiazide is used to treat high blood pressure.  Id.

On March 1, 2006, plaintiff reported recovering well following the surgery. Dr. Simmons diagnosed hyperparathyroidism. (Tr. 445.)

On March 7, 2006, plaintiff complained of coughing, nasal congestion, feeling faint, and fever. Dr. Daugherty assessed influenza, prescribed Amibid DM and Tamiflu, and excused plaintiff from work for two days.[8] (Tr. 429-30.)

On March 20, 2006, plaintiff complained of coughing and shortness of breath and that over-the-counter medication did not provide relief. Dr. Daugherty assessed sinusitis and prescribed Amoxil and Robitussin.[9] (Tr. 428.)

On March 23, 2006, chest X-rays revealed no active intrathoracic disease. (Tr. 448.)

On August 8, 2006, plaintiff complained of increased allergic symptoms and increased depression and requested a medication change. She rated her back pain as four or five of ten and that medication relieved only about ten percent of the pain. Dr. Daugherty informed her that she required surgery and advised her to discontinue smoking. He assessed chronic lumbosacral pain with radiculopathy, depression, bipolar disorder, gastroesophageal reflux disease, allergic rhinitis, fatigue, and tobacco use. He referred her to a spinal specialist, discontinued Xanax, and prescribed Effexor and clonazepam.[10] (Tr. 426.)

On September 6, 2006, plaintiff complained of continued back pain and requested a spinal injection. She reported that Vicodin alleviated the pain, while movement and position changes exacerbated it. She further reported that the changes in medication improved her depression and bipolar disorder. She continued to smoke cigarettes. Dr. Daugherty assessed chronic lumbosacral back pain with radiculopathy, depression, bipolar disorder, and tobacco use and prescribed Flexeril. He strongly encouraged plaintiff to stop smoking. (Tr. 421-22.)

On October 9, 2006, plaintiff complained of head congestion, chills, sore throat, and vomiting that began two days earlier. She further complained of chronic back pain that radiated to her right leg. She continued to smoke cigarettes. Dr. Daugherty assessed viral upper

---

[8] Amibid DM is used to relieve coughing. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014). Tamiflu is used to treat influenza symptoms. Id.

[9] Amoxil is an antibiotic. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014). Robitussin is used to treat symptoms of the common cold. Id.

[10] Effexor is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014). Clonazepam is used to prevent and control seizures. Id.

respiratory infection, depression, bipolar disorder, chronic lumbosacral back pain with radiculopathy, and sore throat and prescribed Claritin.[11] (Tr. 418-19.)

On January 23, 2007, plaintiff complained of an increase in lumbosacral pain after falling on ice and landing on her low back and buttocks two days earlier. Dr. Daugherty assessed lumbosacral pain with right radiculopathy and spasms. He restricted her from lifting more than ten pounds, and repetitively bending, twisting, and turning. He also recommended a home exercise program and excused her from work for one week. (Tr. 413-15.)

On February 1, 2007, plaintiff described her depression as under control but complained of back pain that radiated to the right leg, which she rated as eight of ten. X-rays of the spine revealed no fractures or hardware complications. Dr. Daugherty assessed lumbosacral back pain, anxiety, and depression, scheduled a spine injection, excused her from work for ten days, and restricted her from lifting more than ten pounds, and repetitively bending, twisting, and turning. He noted slow improvement with the lumbosacral pain and described the anxiety and depression as well controlled. (Tr. 409-11.)

On February 9, 2007, plaintiff reported doing well regarding anxiety and depression but complained of increased reflux due to the dosage of Vicodin. Dr. Daugherty assessed lumbosacral back pain, gastroesophageal reflux disease, anxiety, and depression, prescribed cyclobenzaprine and ranitidine, restricted her from lifting more than ten pounds, and repetitively bending, twisting, and turning. (Tr. 405-07.)

On March 6, 2007, MRI scans of the lumbar spine revealed post-surgical changes at L5-S1, degenerative disc diseases at L5-S1, disk desiccation at L4-5, and mild facet hypertrophy with mild posterolateral thecal sac effacement at L4-5. (Tr. 479-80.)

On March 9, 2007, plaintiff complained of increased right leg weakness, foot tingling, and pain in the back and right leg. She described the anxiety and depression as well-controlled. Dr. Daugherty assessed lumbosacral back pain, anxiety, and depression and continued her restrictions and home exercise program. (Tr. 402-04.)

On March 21, 2007, plaintiff complained of lumbosacral pain, which she rated as eight of ten. Joseph Meyer, Jr., M.D., assessed lumbar post-laminectomy pain syndrome, lumbar

---

[11] Claritin is an antihistamine that treats allergic symptoms. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

pseudoarthrosis, lumbosacral radiculitis and neuritis, and leg pain and scheduled an injection procedure. (Tr. 535-36.)

Also on March 21, 2007, plaintiff complained of back pain and right leg weakness. Dr. Parker noted that the recent MRI scan revealed instrumentation in place but "washering" of the screws. He observed a limited range of motion in the spine. He assessed status post posterior spinal fusion at L5-S1 with probable pseudoarthrosis and recommended an interbody fusion procedure at L5-S1 with anterior instrumentation. Plaintiff preferred to wait due to her lack of Family and Medical Leave Act time. Dr. Parker scheduled a spinal injection. (Tr. 456.)

On April 4, 2007, plaintiff received a spinal steroid injection and nerve blocks, and she reported complete resolution of the leg and back pain. Dr. Meyer noted that plaintiff's insurance company would not cover surgery before January 2008 and that plaintiff had not worked since January 22, 2007. He assessed lumbar post-laminectomy pain syndrome, lumbar pseudoarthrosis, lumbosacral radiculitis and neuritis, and leg pain. (Tr. 537-39.)

On April 5, 2007, plaintiff reported significant improvement regarding the pain and expressed the desire to return to work. Dr. Daugherty noted that the procedure suggested by Dr. Parker could worsen plaintiff's back condition and result in neurologic complications. He described the lumbosacral pain and radiculopathy as significantly improved. He restricted her from lifting more than twenty pounds and from repetitive bending, twisting, and turning but authorized her return to work. (Tr. 398-99.)

On April 24, 2007, plaintiff complained of fever, cough, and sinus drainage that began one week earlier. She reported that she scheduled a fusion surgery for January. Jane Moore, R.N., assessed bronchitis and elevated blood pressure. (Tr. 395.)

On April 30, 2007, plaintiff complained of a cough, sinus drainage, and shortness of breath. Nurse Moore assessed left otitis media and bronchitis with reactive airway disease and prescribed Omnicef, albuterol, and Medrol.[12] She also instructed plaintiff to stop smoking. (Tr. 392.)

On May 31, 2007, plaintiff complained of significant back pain, which she rated as eight of ten, but described the anxiety and depression as well-controlled. Dr. Daugherty assessed

---

[12] Omnicef is an antibiotic. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014). Albuterol is used to treat asthma. Id. Medrol is a corticosteroid hormone that is used to reduce symptoms as a result of allergic-type reactions. Id.

lumbosacral back pain with radiculopathy, anxiety, and depression. He described the back pain as slowly worsening and also prescribed Vicodin. (Tr. 388-89.)

On June 13, 2007, plaintiff complained of increased low back pain that radiated to both legs and numbness in both feet. She rated the pain as eight of ten. She reported that the pain impaired her ability to walk but that resting and pain medications reduced the pain to two of ten. Dr. Daugherty assessed lumbosacral back pain with bilateral radiculopathy, prescribed Percocet, excused her from work, and restricted her from lifting more than ten pounds and repetitive bending, twisting, and turning.[13] (Tr. 385-86.)

On July 2, 2007, plaintiff reported that the injections did not improve her condition and described her back pain as unbearable. Dr. Parker noted a limited range of motion of the spine and that movement caused pain. His impression was probable pseudoarthrosis at L5-S1. He recommended a repeat fusion. (Tr. 457.)

On August 3, 2007, Dr. Daugherty noted that plaintiff had scheduled back surgery for August 14, 2007. She reported continued back pain that radiated to the knees and that movement exacerbated the pain. She described the gastroesophageal reflux disease, depression, and bipolar disorder as well-controlled. Dr. Daugherty advised plaintiff to stop smoking and noted that Dr. Parker advised her to stop smoking specifically for the surgery. He assessed gastroesophageal reflux disease, depression, bipolar disorder, anxiety, and lumbosacral back pain with radiculopathy. (Tr. 498-99.)

On August 9, 2007, chest X-rays revealed no acute chest disease. (Tr. 475.)

On August 14, 2007, Dr. Parker performed an anterior interbody fusion with posterior reinstrumentation at L5-S1. Upon discharge on August 19, 2007, plaintiff showed no signed of postoperative concerns. Dr. Parker diagnosed pseudoarthrosis L5-S1 and a history of depression, and her discharge medications included Klonopin, Effexor, Percocet, and Prilosec.[14] (Tr. 460-72.)

On August 29, 2007, plaintiff reported no leg complaints but continued to smoke. Dr. Parker observed well-healed back and abdominal wounds. He recommended that she wear a

---

[13] Percocet is used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

[14] Klonopin is also known as clonazepam. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

corset and advised her that continuing to smoke could impair the effectiveness of the spinal fusion. (Tr. 482.)

On September 14, 2007, plaintiff complained of a lack of appetite since her surgery and mild but improving abdominal pain along the surgical incision. She also complained of chronic, aching back discomfort and that Darvocet did not control the pain.[15] She reported that she continued to smoke three to four cigarettes per day. Dr. Daugherty observed improvement regarding the back condition, discontinued Darvocet, and prescribed Norco.[16] He assessed gastroesophageal reflux disease, abdominal pain, and taste disturbance, prescribed ranitidine, and advised plaintiff to stop smoking.[17] (Tr. 501-02.)

On October 10, 2007, plaintiff reported no significant problems regarding the spinal fusion. She further requested additional time off from work. Dr. Parker observed a mild limitation of lumbar motion, informed plaintiff that she no longer needed a corset, and recommended a walking program to improve strength and endurance. X-rays of the lumbar spine revealed no change in the instrumentation alignment and effective consolidation of the interbody graft. (Tr. 484-85.)

On November 9, 2007, plaintiff reported that ranitidine improved the gastroesophageal reflux disease but complained of increased fatigue, depression, and blood pressure. She also reported falling the previous day, which exacerbated her back pain. Dr. Daugherty excused her from work until December 5, 2007. She reported that medication did not control the back pain and described the pain as a constant spasm. Dr. Daugherty assessed lumbosacral back pain, anxiety, depression, gastroesophageal disease, fatigue, elevated blood pressure, and upper respiratory infection. He increased the dosages of Norco and Effexor, restricted her from lifting and repetitive bending, twisting, and turning, and encouraged to stop smoking and to reduce salt intake. (Tr. 504-05.)

---

[15] Darvocet was used to treat pain. WebMD, http:// www.webmd.com/painman agement/news/20101119/darvon-darvocet-banned (last visited July 21, 2014).

[16] Norco is also known as Vicodin. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

[17] Ranitidine is used to prevent and treat heartburn. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

On November 19, 2007, Lisa Masek submitted a Physical Residual Functional Capacity Assessment regarding plaintiff. She found that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and walk about six hours in an eight-hour workday, sit for about six hours, occasionally climb ramps and stairs, stoop, crouch, and crawl, and never climb ladders, ropes, or stairs. She further found that plaintiff should avoid concentrated exposure to extreme cold and moderate exposure to vibration. (Tr. 491-96.)

On November 20, 2007, plaintiff complained of slowly increasing back pain and increased leg pain. She reported improvement with anxiety and depression but elevated blood pressure. She also reported that she continued to smoke. Dr. Daugherty noted unremarkable blood tests and observed a right leg limp and a significantly decreased torso range of motion. He assessed lumbosacral back pain, anxiety, depression, and elevated blood pressure, advised her to stop smoking, and recommended a low sodium diet and reduction of caffeine intake. (Tr. 507-08.)

On December 5, 2007, plaintiff reported her back pain was completely gone, but she has some right leg complaints. She also reported that she applied for disability benefits. He excused her from work indefinitely. X-rays of the lumbar spine revealed posterior instrumentation in good position and no change in the alignment of the interbody cage at L5-S1. (Tr. 523-24.)

On December 12, 2007, plaintiff reported that Norco controlled the chronic pain. She also reported elevated blood pressure and that she continued to smoke. Dr. Daugherty described the torso range of motion as intact but not limited by the fusion. He also opined that Effexor caused the elevated blood pressure but described the anxiety and depression as well controlled. He assessed lumbosacral back pain with radiculopathy, elevated blood pressure, anxiety, and depression, continued her restrictions, decreased the dosage of Effexor, and encouraged her to discontinue smoking. (Tr. 510-11.)

On January 14, 2008, plaintiff complained of back pain, wrist and ankle discomfort, and numbness of the right shoulder and neck. She further reported an episode of right-sided body numbness and face numbness that lasted two hours. She reported that the lower dosage of Effexor resulted in decreased blood pressure levels and that Celexa controlled anxiety and depression. She further complained of increased reflux symptoms but reported that she exhausted her supply of Zantac. She also reported that Norco adequately controlled her back pain. Additionally, she reported smoking a half pack to a whole pack of cigarettes per day. X-rays of

the cervical spine revealed significant disc space narrowing at C6-7 with arthritic changes and neuroforaminal narrowing. Electrocardiogram results revealed a normal sinus rhythm. Dr. Daugherty considered transient ischemic attack, assessed neck pain with radiculopathy, chest pain, hypertension, anxiety, depression, and arthralgia, and restricted her from lifting more than ten pounds and repetitive bending, twisting, and turning. He also recommended a stress test, MRI of the cervical spine, CT scan of the head, and carotid ultrasound, advised her to reduce sodium intake and to discontinue smoking, and restarted Zantac. (Tr. 514-15.)

On January 20, 2008, plaintiff reported that she had not received the head CT, neck MRI, or carotid ultrasound or obtained Zantac. She described the anxiety and depression as under control but complained of right arm and leg weakness and neck pain with radiculopathy. Plaintiff considered the use of Chantix.[18] Dr. Daugherty assessed neck pain with radiculopathy, gastroesophageal reflux disease, anxiety, and depression. He recommended that she proceed with the cervical spine MRI, head CT, and carotid ultrasound and obtain Zantac. (Tr. 517-18.)

On February 18, 2008, plaintiff complained of neck and right arm pain but reported no back pain. Lumbar spine X-rays revealed no change in the instrumentation alignment. Cervical spine X-rays revealed severe degenerative disc disease at C6-7. Dr. Parker's impression was radicular neck and arm pain, and he scheduled an epidural injection. (Tr. 525-26.)

On March 5, 2008, plaintiff complained of neck and back pain but reported no further facial numbness or chest pain. A CT scan of the head revealed no evidence of mass lesions or acute hemorrhage. A carotid ultrasound revealed mild bilateral carotid artery stenosis. Dr. Daugherty assessed neck pain with radiculopathy and hypertension and prescribed Anaprox DS, hydrochlorothiazide, and potassium chloride.[19] (Tr. 554-55.)

On March 11, 2008, Dr. Parker submitted a medical source statement regarding plaintiff's physical condition. He found that plaintiff could frequently lift ten pounds, occasionally lift twenty-five pounds, stand, walk, and sit for three hours, push and pull only twenty pounds, occasionally climb, balance, stoop, kneel, and crouch, and never bend. He further found that she should avoid extreme temperatures and vibrations due to degenerative disc disease of the cervical

---

[18] Chantix is used to help stop smoking. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).
[19] Anaprox DS is a nonsteroidal anti-inflammatory drug used to relieve pain. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

and lumbar spine.  He cited to MRI and CT scans that indicated pseudoarthrosis of the spine, which required a lumbar interbody fusion.  He indicated that plaintiff would benefit from rest and that she needed to assume a reclining position or a supine position for up to thirty minutes one to three times per day.  He further indicated that she needed to elevate her legs one to three times per day.  (Tr. 529-30.)

On March 13, 2008, plaintiff complained of radiating back pain and intermittent numbness and tingling in the right arm and hand.  She reported that bending, lifting, and reaching worsened the pain.  Dr. Meyer administered an epidural steroid injection to the cervical spine.  He assessed cervical intervertebral disc disorder with myelopathy, lumbar post-laminectomy pain syndrome, lumbar pseudoarthrosis, lumbosacral radiculitis, and leg pain.  (Tr. 540-52.)

On March 20, 2008, plaintiff reported improved blood pressure levels and that she smoked only three to four cigarettes per day with the assistance of Chantix.  She reported neck and back pain, which she rated as eight of ten without medication and five of ten with medication.  She reported that she frequently changed positions for relief and that the pain limited her ability to lift, sit, stand, and walk.  Dr. Daugherty assessed lumbosacral back pain with radiculopathy, neck pain, and hypertension.  (Tr. 557-58.)

Also on March 20, 2008, Dr. Daugherty submitted a medical source statement regarding plaintiff's physical condition.  He found that plaintiff could frequently lift ten pounds, occasionally lift ten pounds, stand and walk for two or three hours per day total and continuously for fifteen minutes, and sit for two to three hours per day total and continuously for thirty minutes.  He also indicated that her ability to push or pull was limited due to radiculopathy of the arms and legs.  He found that she could never climb, balance, or crouch, and could only occasionally stoop, kneel, and bend.  He further found her limited with reaching and handling and that she should avoid heights, machinery, and vibrations.  He indicated that plaintiff needed to assume a reclining position and supine position each for up to thirty minutes one to three times per day.  (Tr. 532-34.)

On April 14, 2008, plaintiff reported that the epidural injection alleviated the neck pain but did not decrease the right arm pain, numbness, or tingling.  She reported difficulty with her right hand grip and generalized right side weakness.  Dr. Meyer assessed lumbar post-

laminectomy pain syndrome, lumbar pseudoarthrosis, lumbosacral radiculitis, and leg pain, recommended nerve conduction studies of the arms, and discontinued Flexeril. (Tr. 543-45.)

On April 22, 2008, plaintiff reported that her medication controlled her anxiety, depression, and neck and back pain. Dr. Daugherty assessed lumbosacral pain with radiculopathy, anxiety, depression, neck pain, and hypertension, and prescribed Celexa. (Tr. 560-61.)

On May 6, 2008, plaintiff complained of increased pain in both wrists and ankles, back pain with radiculopathy, and neck pain but described the pain as adequately controlled. She also reported increased anxiety and depression due to the loss of family members. Dr. Daugherty assessed wrist and ankle pain, hypertension, dental abscess, anxiety, depression, and back and neck pain. He increased the dosage of Celexa and prescribed amoxicillin. (Tr. 563-64.)

On May 12, 2008, plaintiff complained of neck pain, right arm weakness, right leg pain and weakness, and right foot tingling. She rated the pain as eight of ten. Nerve conduction studies of the arms revealed no abnormalities. Dr. Meyer administered an epidural injection to the cervical spine. He assessed cervical intervertebral disc disorder with myelopathy, lumbar post-laminectomy pain syndrome, lumbar pseudoarthrosis, lumbosacral radiculitis, and leg pain. He also recommended physical therapy to improve strength. (Tr. 546-49.)

On May 23, 2008, plaintiff complained of right ear pain and increased sinus problems and requested Zantac. She also complained of mildly increased anxiety and depression and requested an increased dosage of Celexa. Dr. Daugherty assessed allergic rhinitis, right ear injection, anxiety, depression, and back and neck pain. He prescribed Allegra, increased the dosage of Celexa, and planned to treat the back and neck pain conservatively.[20] (Tr. 566-67.)

On June 9, 2008, plaintiff reported that the previous epidural injection did not improve the pain. Dr. Meyer administered an epidural injection to the lumbar spine and assessed post-laminectomy pain syndrome, lumbar pseudoarthrosis, leg pain, and cervical intervertebral disc disorder with myelopathy. He referred her to physical therapy. (Tr. 550-52.)

On June 13, 2008, plaintiff complained of low back pain but reported that Norco decreased the pain to a tolerable level. She also reported improved anxiety and depression. Dr.

---

[20] Allegra is an antihistamine used to relieve allergy symptoms. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

Daugherty assessed back and neck pain with radiculopathy, anxiety, depression, and hypertension. (Tr. 569-70.)

On July 17, 2008, plaintiff reported transportation issues with her physical therapy appointments and requested appointments at a local hospital. She further reported that she discontinued care at the pain clinic. She complained of back pain that radiated to the right leg. Dr. Daugherty assessed neck and back pain with radiculopathy, anxiety, and depression. (Tr. 572-73.)

On July 24, 2008, plaintiff saw nurse Moore for a woman's health examination. She reported that Celexa controlled her depression. Additionally, nurse Moore described plaintiff's blood pressure as well controlled. (Tr. 575-76.)

On August 18, 2008, plaintiff complained of increased low back pain and neck pain but reported that medication controlled the pain. Dr. Daugherty assessed lumbosacral back pain with radiculopathy, cervical and thoracic back pain, and varicose veins and prescribed Medrol. (Tr. 578-79.)

On September 3, 2008, plaintiff complained of back and neck pain with an emphasis on the neck pain. She further reported right leg weakness and that the neck pain radiated to the right arm. She requested an operative procedure. Dr. Parker observed a full lumbar range of motion. X-rays of the lumbar spine revealed a solid interbody fusion at L5-S1 and posterior instrumentation in position. Dr. Parker scheduled MRI scans of the lumbar and cervical spine and noted that cervical epidural injections did not improve her condition long term. (Tr. 553.)

On September 11, 2008, plaintiff complained of radiculopathy in both arms and legs and neck and back pain, which she rated as eight of ten. Plaintiff reported that Norco adequately controlled the pain. She also reported lack of insurance coverage and that Dr. Parker did not accept Medicaid but she attempted to obtain coverage through a former insurer. Dr. Daugherty assessed neck pain with radiculopathy and lumbosacral back pain with radiculopathy. (Tr. 581-82.)

On September 23, 2008, plaintiff complained of continued burning in the ankles and wrists and neck and lumbosacral pain. Dr. Daugherty observed a right leg limp and a significantly reduced torso range of motion. He assessed neck pain and back pain with

radiculopathy. He noted that conservative treatment did not benefit plaintiff and referred her to neurosurgery. (Tr. 584-85.)

On December 16, 2008, plaintiff reported dissatisfaction with Norco and requested Vicodin. She complained of weakness in the extremities and right leg pain, which she rated as eight of ten. Dr. Daugherty observed an abnormal gait, assessed neck and back pain with radiculopathy, and prescribed Vicodin. (Tr. 588-89.)

On March 26, 2009, Pathways Community Behavioral Healthcare performed an initial assessment on plaintiff. She reported that she lived with her husband, who was unemployed and injured in a car accident in December 2008. She graduated from high school. She attempted suicide over one year ago. She reported that she needed care because of mood fluctuations and general loss of interest. Her expectations for Pathways included medication and stress management. Susan Jenner, MA., LPC, described plaintiff as unkempt, disheveled, and hyperactive and observed a dysphoric mood and depressed, flat affect. She complained of severe depression. Ms. Jenner provided plaintiff with medication therapy and placed her on the waiting list for care with the Comprehensive Psychiatric Rehabilitation Center. (Tr. 597-607.)

On March 27, 2009, plaintiff complained of continued back pain and joint pain with inflammation in the joints of the hands, elbows, shoulders, and knees. She also complained of chronic fatigue and mild anxiety. She reported that hydrocodone did not control the back pain and requested Percocet. She reported that she continued to smoke and refused to schedule a mammogram. Dr. Daugherty encouraged her to discontinue smoking. He assessed arthralgia, fatigue, chronic lumbosacral back pain with radiculopathy, anxiety, and depression and prescribed Mobic and Percocet.[21] (Tr. 612-13.)

On April 9, 2009, Bhaskar Y. Gowda, M.D., performed a psychiatric evaluation on plaintiff. He assessed panic disorder, bipolar disorder, and a GAF score of 50 and prescribed Wellbutrin, Celexa, and clonazepam.[22] (Tr. 592-95.)

---

[21] Mobic is used to treat arthritis. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

[22] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worse of the two components.

On April 10, 2009, plaintiff complained of arthralgia in multiple joints, right side pain, and increased right leg weakness. She reported that Percocet did not alleviate her pain and requested Vicodin. She noted that Dr. Gowda increased her clonazepam dosage. She further reported that her insurance did not cover Mobic or diclofenac. Dr. Daugherty assessed lumbosacral back and neck pain with radiculopathy, significant right-sided weakness, arthralgia, and claustrophobia. He prescribed Medrol and Vicodin and scheduled MRI scans of the brain and cervical spine. He also strongly recommended a mammogram. (Tr. 615-17.)

On April 30, 2009, plaintiff reported improved mood. Dr. Gowda continued her medication. (Tr. 608.)

On May 11, 2009, plaintiff complained of neck pain that radiated to both arms and right arm and hand weakness, numbness, and tingling. She also complained of chronic back pain that radiated to both legs. Cervical spine MRI revealed multilevel degenerative spinal changes with disc bulging at C6-7. The impression of Bashar Mohsen, M.D., was chronic neck pain. He discontinued Flexeril and Vicodin, prescribed Ultram and Zanaflex, and recommended a nerve conduction study.[23] (Tr. 633-37.)

On May 20, 2009, plaintiff reported moderate pain and that hydrocodone did not control it. She further complained of right-sided weakness. Dr. Daugherty assessed neck and back pain with radiculopathy, right-sided weakness, and elevated blood pressure and prescribed Percocet and Flexeril. (Tr. 619-20.)

On June 18, 2009, a cervical spine nerve conduction study revealed no abnormalities. (Tr. 679-81.)

On July 16, 2009, plaintiff reported improved anxiety and mood. Dr. Gowda continued her medications. (Tr. 657.)

---

A GAF score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed.2000).

[23] Ultram is used to relieve moderate to moderately severe pain. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014). Zanaflex is used to treat muscle spasms. Id.

On July 21, 2009, Dr. Gowda submitted a medical assessment regarding plaintiff. He found that, considering her pain and anxiety, plaintiff had fair ability to deal with the public but poor or no ability to use judgment, interact with supervisors, deal with work stress, function independently, or maintain concentration. He further found that plaintiff had poor or no ability to understand, remember, or perform simple, detailed, or complex instructions. Additionally, he found that she had fair ability to behave in an emotionally stable manner and poor or no ability to maintain personal appearance, relate predictably in social situations, and demonstrate reliability. (Tr. 641-42.)

On July 24, 2009, a lumbar spine nerve conduction study revealed no abnormalities and no evidence of lumbar radiculopathy. (Tr. 689.)

On July 28, 2009, plaintiff reported pain in both legs and right-sided weakness. Dr. Mohsen's impression was chronic neck and back pain, right-sided weakness, and restless leg syndrome. He recommended a brain MRI with contrast and prescribed Mirapex.[24] (Tr. 692.)

On August 13, 2009, plaintiff complained of moderate back discomfort and intermittent burning in both ankles. She planned to use Nicoderm patches and described anxiety and depression as under control. Dr. Daugherty assessed hypertension, gastroesophageal reflux disease, anxiety, depression, chronic neck and back pain with right radiculopathy, carotid artery disease, restless leg syndrome, fatigue, and headaches. He noted upcoming blood work and neurosurgery evaluation and recommended a carotid ultrasound. (Tr. 660-62.)

On August 20, 2009, Dr. Gowda prescribed Wellbutrin, Celexa, and clonazepam. (Tr. 675.)

On September 22, 2009, plaintiff complained of low back pain that radiated to her right leg. She reported difficulty with sitting, standing, or walking and that she had stopped smoking. Lumbar X-rays revealed intact instrumentation at L5-S1 and mild spondylitic changes. The impression of Joel T. Jeffries, M.D., was recurrent back and right leg pain status post L5-S1 anterior posterior fusion. He recommended an MRI scan of the lumbar spine. (Tr. 666-72.)

On October 20, 2009, plaintiff complained of back and neck pain. Brian Edwards, D.O., increased the Percocet dosage and prescribed Mobic. (Tr. 713.)

---

[24] Mirapex is used to treat restless leg syndrome and Parkinson's disease. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

On November 5, 2009, plaintiff complained of low back pain. The impression of Dr. Mohsen was low back pain. He recommended a lumbar spine MRI and prescribed Lidoderm.[25] (Tr. 697.)

On November 19, 2009, Dr. Gowda prescribed Seroquel, Wellbutrin, Celexa, and clonazepam.[26] (Tr. 706.)

On November 20, 2009, plaintiff complained of right leg pain, which she rated as eight of ten. Dr. Edwards prescribed Elavil.[27] (Tr. 714.)

On November 24, 2009, plaintiff complained of fever, right ear ache, congestion and increased right leg pain. The impression of Michelle R. Barg, M.D., was sinusitis and right leg pain, and she prescribed Amoxil. (Tr. 715.)

On December 17, 2009, Dr. Gowda increased the Seroquel dosage and prescribed Wellbutrin, Celexa, and clonazepam. (Tr. 707.)

On December 23, 2009, plaintiff complained of a weakened right hand grip. Dr. Edwards observed a significant decrease in right hand grip. He assessed chronic pain and right hand weakness and recommended an MRI. (Tr. 717.)

On January 14, 2010, plaintiff complained of constant irritability. Dr. Gowda prescribed Seroquel, Wellbutrin, Celexa, and clonazepam. (Tr. 730.)

On February 25, 2010, plaintiff complained of side effects from the increased dosage of Seroquel and that stopping Seroquel caused increased mood fluctuations. Dr. Gowda prescribed Neurontin.[28] (Tr. 731.)

---

[25] Lidoderm is a local anesthetic used to relieve nerve pain after shingles. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

[26] Seroquel is used to treat certain mental/mood conditions. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

[27] Elavil is used to treat certain mental/mood disorders including depression. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

[28] Neurontin is used to prevent and control seizures and relieve nerve pain caused by shingles. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

On March 25, 2010, plaintiff complained of constant pain and irritability and expressed concern regarding her disability benefits application. Dr. Gowda increased the Neurontin dosage and decreased the clonazepam dosage. (Tr. 732.)

On April 22, 2010, plaintiff complained of continued back pain but improved energy. Dr. Gowda prescribed Wellbutrin, Neurontin, and clonazepam. (Tr. 733.)

Also on April 22, 2010, plaintiff complained of chronic back and right leg pain and reported that she had had no medication for the past month. She further complained of fluctuating blood pressure. Dr. Edwards prescribed Prilosec. (Tr. 754.)

On July 29, 2010, plaintiff reported feeling depressed, hopeless, and helpless and increased crying spells. She reported that she has had no medication due to financial problems. Dr. Gowda prescribed Celexa, Ativan, and Wellbutrin.[29] He also encouraged vocational technical training. (Tr. 735-36.)

On August 13, 2010, plaintiff complained of blood pressure, heartburn, and burning in the joints. She further reported exhausting her supply of pain medication more quickly than indicated by her prescription. The impression of Dr. Edwards was chronic pain, gastroesophageal reflux disease, and hyper tension, and he prescribed Lisinopril.[30] (Tr. 755.)

On August 16, 2010, Kristy A. Kauffman, LPC, MS, performed a comprehensive assessment on plaintiff. Plaintiff reported impulsive spending, racing thoughts, anger, crying spells, and anxiety and that she had had these symptoms throughout her life. She further reported good relationships with her mother, husband, and daughters. She enjoyed crafts and spending time with grandchildren. The impression of Ms. Kauffman was bipolar I disorder and personality disorder, and she assessed a GAF of 50. (Tr. 739-50.)

On September 13, 2010, plaintiff complained of low back and right leg pain, which she rated as seven of ten. The impression of Dr. Edwards was hypertension. (Tr. 756.)

---

[29] Ativan is used to treat anxiety. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

[30] Lisinopril is used to treat high blood pressure. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

On October 4, 2010, plaintiff complained of sinus congestion and coughing. The impression of Dr. Barg was sinusitis or bronchitis and hypertension. She increased the dosage of Lisinopril and prescribed Amoxil. (Tr. 758.)

On May 3, 2011, plaintiff complained of burning joint pain and arm and leg weakness. She reported that she could not afford more testing due to lack of insurance and that she needed a work excuse note. Dr. Edwards assessed chronic pain syndrome and prescribed prednisone and recommended an MRI. (Tr. 760-61.)

On May 31, 2011, plaintiff complained of burning joint pain. Tawnyia Jerome, M.D., assessed chronic pain. Plaintiff refused Neurontin due to its previous effect on her mood, and Dr. Jerome prescribed Mobic. (Tr. 762-64.)

On August 1, 2011, plaintiff reported that she worked the previous week and that the standing caused back pain, which caused her to miss days of work. She expressed concern that her employer would terminate her and requested a cortisone shot. Dr. Edwards assessed back pain, administered a Kenalog injection, and recommended that she rest for the remainder of the week.[31] (Tr. 765-66.)

On August 11, 2011, plaintiff requested a release to continue work. Dr. Edwards assessed chronic pain syndrome and planned to release her to work during the following week. (Tr. 767-68.)

On October 4, 2011, plaintiff complained of low back pain that radiated to the right leg and requested medication for arthritis pain. She reported that she had obtained insurance coverage and requested time from work. Dr. Edwards assessed back pain, lumbar radiculopathy, anxiety, depression, and arthritis. He discontinued Mobic and prescribed nabumetone, Lidoderm, Xanax, Lamictal, and Chantix.[32] (Tr. 769-71.)

---

[31] Kenalog is a corticosteroid that reduces symptoms such as swelling. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

[32] Nabumetome is used to reduce arthritis symptoms. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014). Lamictal is used to prevent and control seizures. Id.

On October 26, 2011, plaintiff complained of sore throat and right ear pain and reported that she could not work forty hours per week. Dr. Edwards assessed otitis media and prescribed Z-Pak tablets.[33] (Tr. 772-73.)

On November 14, 2011, plaintiff complained of increased neck and right arm pain in addition to right leg pain. X-rays of the lumbar spine revealed well-aligned interbody fusion at L5-S1, and X-rays of the neck revealed severe degenerative changes at C6-7 but no other abnormalities. Dr. Parker scheduled an MRI scan of the neck and recommended that she reapply for disability benefits. (Tr. 778.)

On November 15, 2011, plaintiff complained of right leg pain and right shoulder pain and reported that she had tried to return to work on a part-time basis. She requested another week from work. Dr. Edwards assessed chronic pain syndrome and benign hypertension. (Tr. 774-75.)

On November 30, 2011, plaintiff reported that she left work early the prior week due to back pain and leg weakness, which resulted in the inability to stand. Dr. Edwards noted that plaintiff had rescheduled an MRI because the MRI equipment caused anxiety. He assessed chronic pain syndrome, excused her from work, and opined that she might require surgery. (Tr. 776-77.)

On December 5, 2011, plaintiff complained of pain in the neck and right arm. An MRI scan of the cervical spine revealed multilevel disc bulges, including moderate degenerative changes at C4-5 and fairly severe degenerative changes at C5-6 and C6-7. The impression of Dr. Parker was severe degenerative disc disease from C4 to C7. Plaintiff stated that she wanted to avoid surgery. Dr. Parker opined that she could not perform gainful work due to the chronic pain from the neck and lumbar fusion. (Tr. 779-80.)

On February 2, 2012, plaintiff complained of sinus drainage, congestion, and coughing. Dr. Edwards assessed acute bronchitis, chronic pain syndrome, and benign hypertension. (Tr. 782-83.)

On February 16, 2012, plaintiff complained of burning joints in the legs and arms. She further reported that pain caused the inability to sleep and that Percocet did not alleviate the pain. Dr. Parker assessed arthralgia and prescribed prednisone.[34] (Tr. 784-85.)

---

[33] Z-Pak tablets are antibiotic medication. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

**First ALJ Hearing**

The ALJ conducted a hearing on January 5, 2010. (Tr. 65-80.) Plaintiff testified to the following. She worked as a branch manager and managed two employees. She had previously worked as a teller. She received unemployment benefits in 1999. She experimented with drugs at age twenty-five. (Tr. 68-69.)

Low back pain prevents her from working. Surgical procedures on her back in 2003 and 2007 caused pain and resulted in scar tissue damage. The surgical procedures also affect her leg and ability to walk. She experiences depression. She receives care at Pathways and with Dr. Gowda, whom she saw two weeks ago. (Tr. 69-70.)

She lives in a trailer with her spouse. On a typical day, she awakens at about 8:30 a.m. and eats. She can walk for twenty to thirty minutes before she must rest. Her husband assists her with pants but she bathes herself. She can stand at the sink to wash dishes for about twenty minutes before she must rest due to back pain. She must lie down four times per day in forty to fifty minute sessions. She watches television. She cries two or three times per day in twenty to thirty minute sessions. She takes medication for the crying, which helps occasionally. She can fold clothes for about thirty minutes before she must rest due to back pain. She sleeps only three to four hours per night, which leaves her tired and groggy. She has difficulty concentrating, which she has discussed with Dr. Gowda. (Tr. 69-74.)

At Bon Hoffman Press, she worked as a laborer and carried boxes of books that weighed up to fifty pounds. She last worked there in April 2007 but quit due to the inability to walk and back pain. She briefly returned to work but stopped due to scheduled surgery. Dr. Mohsen examined her neurology and prescribed fentanyl patches. She also takes Percocet. She receives treatment for depression at Pathways and from Dr. Gowda. She continues to receive treatment from Dr. Mohsen. She last saw Dr. Edwards in December 2009. She received physical therapy and shots, which did not improve the pain. (Tr. 74-78.)

**First Decision of the ALJ**

On April 27, 2010, the ALJ issued a decision that plaintiff was not disabled. (Tr. 90-100.) However, on October 27, 2011, the Appeals Council remanded the decision to the ALJ because

---

[34] Prednisone is a corticosteroid used to reduce allergic symptoms. WebMD, http://www.webmd.com/drugs (last visited on July 21, 2014).

the ALJ's decision did not include an evaluation of Dr. Parker's opinion, improperly evaluated the opinions of Dr. Gowda and Dr. Daugherty, did not assess plaintiff's ability to perform mental activities, and contained no vocational expert testimony. (Tr. 102-04.) The Appeals Council remanded with instructions to further consider and assess the treating source opinions and plaintiff residual functional capacity and to obtain vocational expert testimony. (Id.)

**Second ALJ Hearing**

Following the remand, The ALJ conducted a hearing on February 13, 2012. (Tr. 31-59.) Plaintiff testified to the following. She lives in a house with her spouse. Her spouse has received social security benefits since 2009. She has training as a bill collector and bank branch manager and in human resources. She supervised one person as a branch manager. Since 2010, she has worked part-time at Wal-Mart as an associate and arranges bedding. She also worked for the Hoffman Bundlers where she bundled the pages of books. Additionally, in 1999, she sold Aflac insurance. She worked as a bookkeeper for Voss Holding Company, rolled screens for Quaker Window Products, laundered for Retirement Center Management, and collected bills for Revenue Management of Missouri. She received unemployment benefits in 1999. (Tr. 34-38.)

She continues to receive back treatment from Dr. Parker. She has complied with her prescriptions, except when she could not afford the medication. She can sit for twenty to thirty minutes before she experiences low back and neck pain. To relieve the pain caused by sitting, she lies or walks about three or four times per day for about thirty minutes. She can stand for twenty minutes before she experiences leg, back, and arm pain. She takes a muscle relaxer or pain pill to relieve the pain caused by standing. (Tr. 39-45.)

She works twenty-four hours or three days per week. She misses six to eight days per month and has never worked forty-eight hours in a pay period. In order to work, she takes pain pills and muscle relaxers. Sometimes, she takes more pain medication than prescribed. Some days, she cannot walk due to her leg. Her medications occasionally make her sick. She worked as a cashier but later moved to bedding. She stands and walks for most of her eight-hour shifts. At the end of the day, her right leg drags. She could not work two days in a row due to difficulty walking and the amount of pain. (Tr. 45-48.)

On about eight days per month, she sits and cries due to the pain. Her spouse was injured in a motor vehicle accident and cannot walk or stand for long periods of time due to his right leg. She cooks. Her daughters shop, clean, launder, vacuum, and sweep for her. She does not own a computer. She occasionally attends church. She owns a dog. She is not required to perform physical therapy exercises. Her grandchildren visit her, and she occasionally attends their school activities. She can drive. She does not lift more than twenty pounds at her job. (Tr. 48-51.)

Vocational Expert (VE) Doris Gonzales also testified at the hearing. When plaintiff worked in human resources, she worked as a clerk. She worked as ground help for the tree trimming company. Her past relevant work includes bill collector, which is light, semiskilled work; branch manager, which is sedentary, skilled work; human resources clerk, which is sedentary, semiskilled work; material handler, which is heavy, semiskilled work; packager or packer, which is medium, unskilled work; convenience store clerk, which is light, unskilled work; hotel housekeeper, which is light, unskilled work; retail sales clerk or cashier, which is light, semiskilled work; window assembler, which is medium, unskilled work; tree trimmer helper, which is medium, unskilled work; bank teller, which is light, semiskilled work; bundler, which is medium, unskilled work; bookkeeper, which is sedentary, semiskilled work; insurance salesperson, which is light, semiskilled work; and laundry worker, which is medium, unskilled work. Plaintiff's transferable skills include management skills, clerical skills, computer skills, customer service skills, sales, and math skills. (Tr. 52-55.)

The ALJ presented the VE a hypothetical individual that could perform light, unskilled work, could frequently stoop, crouch, and crawl, could never climb ropes, ladders, and scaffolding, and should avoid hazard machinery and heights. The VE responded that such individual could perform plaintiff's past relevant work as a convenience store clerk and hotel housekeeper. Such individual could also work as an order caller, which is light, unskilled work with 2,815,240 positions nationally, 68,140 positions in Missouri, and 290 positions in the central Missouri area; furniture rental consultant, which is light, unskilled work with 416,950 positions nationally, 7,310 positions in Missouri, and 320 positions in the central Missouri area; and a mail clerk with 131,750 positions nationally, 3,430 positions in Missouri and 160 positions in the central Missouri area. (Tr. 55-57.)

Plaintiff's counsel also presented the VE a hypothetical individual, who could stand, sit, and walk for only three hours per day and needed to recline and elevate her legs at least three times per day for thirty minutes at time. The VE replied that such individual could perform no work. An individual with no ability to deal with work stresses or to engage with supervisors or the public could also perform no work. Missing six days of work per month would also preclude regular work. (Tr. 57-59.)

### III. DECISION OF THE ALJ

On September 25, 2013, the ALJ issued a decision that plaintiff was not disabled. (Tr. 290-303.) At Step One of the prescribed regulatory decision-making scheme,[35] the ALJ found that plaintiff had not engaged in substantial gainful activity since February 23, 2007, the alleged onset date. At Step Two, the ALJ found that plaintiff's severe impairments included degenerative disc disease of the lumbar and cervical spine, depression, and anxiety disorder. (Tr. 19.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 21.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform light work, except that she can frequently stoop, crouch, and crawl, never climb ladders, ropes, or scaffolds, and must avoid working at heights or around moving machinery. The ALJ further indicated that she had moderate limitations with concentration, persistence, and pace but could understand, remember, and perform at least simple instructions and non-detailed tasks. At Step Four, the ALJ found that plaintiff could perform past relevant work as a convenience store clerk and hotel housekeeper. (Tr. 22-24.)

Alternatively, at Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy. (Tr. 24.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are

---

[35] See below for explanation.

supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW).  Id. § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating she is no longer able to return to her PRW.  Pate-Fires, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  Id.; 20 C.F.R. § 404.1520(a)(4)(v).

# V. DISCUSSION

Plaintiff argues that the ALJ erred by: (1) finding plaintiff not credible and (2) improperly evaluating the opinion of her treating physicians, Dr. Parker, Dr. Daugherty, and Dr. Gowda.

## A. Credibility

Plaintiff argues that the ALJ erroneously discounted plaintiff's allegations. To evaluate a claimant's subjective complaints, the ALJ must consider, but need not explicitly discuss, the Polaski factors:[36] "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010). Other relevant factors include the subject's work history and the absence of supporting objective medical evidence. Id. The ALJ may also consider inconsistencies in the record as a whole. Id. "[Courts] defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." Id.

The ALJ found plaintiff's allegations regarding pain and mental impairment not fully credible. Plaintiff argues that the ALJ failed to consider the Polaski factors. However, the ALJ expressly discussed plaintiff's activities, including working part-time, attending church, and maintaining a household. (Tr. 21, 23.) Additionally, the ALJ considered plaintiff's recovery from back surgery and the back and neck evaluations that revealed no abnormalities. (Tr. 22-23.) He also noted a negative nerve conduction study and MRI scans. (Tr. 23.) He further noted that the treatment notes reported that plaintiff's anxiety and depression were under control. (Id.) He also described her testimony as rehearsed but not indicative of severe physical or mental distress. (Id.) He further discussed her allegations that medication caused grogginess and difficulty concentrating, but he noted the absence of such complaints in the treatment records. (Id.) Based on the forgoing, the court concludes that the ALJ considered the Polaski factors.

Plaintiff argues that the ALJ failed to consider plaintiff's work record prior to 2007. However, "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). Additionally, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was

---

[36] Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

not considered." Id. Plaintiff also argues that the ALJ failed to consider the observations of her treating physicians. However, the ALJ expressly referred to the findings and opinions of Dr. Gowda, Dr. Daugherty, and Dr. Parker. (Tr. 20, 23.)

Additionally, plaintiff argues that the ALJ erroneously considered his personal observations when he described plaintiff's testimony as rehearsed. "While the ALJ may disbelieve a claimant's subjective complaints of pain because of inherent inconsistencies or other circumstances, the ALJ is not free to reject such complaints solely on the basis of personal observations made during the hearing." Smith v. Heckler, 735 F.2d 312, 318-19 (8th Cir. 1984). Although the ALJ considered his personal observations before rejecting plaintiff's complaint, the ALJ also considered several other legally appropriate factors as set forth above.

Accordingly, substantial evidence supports the ALJ's determination regarding plaintiff's credibility, and plaintiff's arguments are without merit.

## B. Opinion Evidence

Plaintiff argues that the ALJ improperly considered the opinions of her treating physicians, Dr. Parker, Dr. Daugherty, and Dr. Gowda. The ALJ should consider each of the following factors in evaluating medical opinions: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is also a specialist; and (6) any other factors brought to the ALJ's attention. 20 C.F.R. § 416.927(c). Further, an ALJ is not obligated to defer to a treating physician's medical opinion unless it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [is] not inconsistent with the other substantial evidence in the record." Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008) (quoting Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005)).

The ALJ gave no credit to the March 2008 opinion of Dr. Parker, the March 2008 opinion of Dr. Daugherty, and the July 2009 opinion of Dr. Gowda. (Tr. 23.) The ALJ reasoned that the opinions were inconsistent with the record as a whole and particularly plaintiff's testimony regarding her daily activities, including working three eight-hour shifts per week in addition to maintaining her household, caring for a dog, attending church, and attending her grandchildren's school activities. (Id.)

The court agrees that the evidence regarding plaintiff's daily living activities contradicts the opinions of Dr. Parker and Dr. Daugherty. For example, Dr. Parker indicated that plaintiff could stand and walk for only three hours per day. (Tr. 529-30.) Similarly, Dr. Daugherty indicated that plaintiff could stand and walk for only two or three hours per day and continuously for only fifteen minutes. (Tr. 532-34.) However, plaintiff testified that she worked eight-hour shifts and remained on her feet throughout most of the shifts. (Tr. 45-47.) Although plaintiff's part-time employment alone does not wholly contradict plaintiff's allegations of disability, her description thereof directly contradicts the findings of Dr. Parker and Dr. Daugherty.

Additionally, in his assessment of plaintiff's mental capacity, Dr. Gowda found that plaintiff had poor or no ability to use judgment, interact with supervisors, deal with work stress, function independently, maintain concentration, understand, remember, or perform simple, detailed, or complex instructions, maintain personal appearance, relate predictably in social situations, or demonstrate reliability. (Tr. 641-42.) However, plaintiff did not testify that her mental impairments affected her ability to work, and, as noted by the ALJ, the treatment records repeatedly described the anxiety and depression as under control. (Tr. 23, 388-89, 402-04, 409-11, 434-36, 498-99, 514-15, 517-18, 563-64, 575-76, 660-62.)

Accordingly, substantial evidence supports the ALJ's decision regarding the opinions of Dr. Parker, Dr. Daugherty, and Dr. Gowda.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

_____/S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 1, 2014.